877 So.2d 1171 (2004)
James Thomas MILLAGE, Plaintiff-Appellee
v.
BUILDER'S LUMBER & SUPPLY COMPANY, Defendant-Appellant.
No. 38,635-WCA.
Court of Appeal of Louisiana, Second Circuit.
July 2, 2004.
*1172 Rabalais, Unland & Lorio, by James C. Arceneaux, IV, for Appellant.
Storms & Storms, by Richard R. Storms, P.C., Ruston, for Appellee.
Before STEWART, DREW and HARRISON (Pro Tempore), JJ.
DREW, J.
On April 22, 2002, James Millage filed a disputed claim for workers' compensation in the Office of Workers' Compensation (OWC) alleging that on February 21, 2002, he injured his back in an accident while working for Builder's Lumber and Supply Company (BLS). Worker's Compensation Judge (WCJ) Sean Jackson in District 1W of the OWC[1] awarded Millage temporary total disability benefits and medical benefits, but rejected his claim for penalties and attorney fees. BLS now appeals; Millage has answered the appeal seeking penalties and attorney fees. We reverse and render, further rejecting the claimant's demand for penalties and attorney fees.

FACTS
Clarence Eugene Nichols, Jr., owns BLS, a building material supply store in Homer where claimant was a laborer. Millage's tasks included moving lumber from shelves and loading it onto the customers' trucks.
Millage testified that on February 21, 2002, he injured his back while moving a load of lumber. He said:
... I reached to get the plywood off the shelf. And I went to turn it and load it in the truck and that's when I hurt my back, the lower part of my back.
He said that he felt an immediate pain in his back during this maneuver. There was no witness to the incident. Millage testified that he was able to load "a couple of" other customers' supplies and then went inside the office to tell his coworkers that he had hurt his back. Nichols was not in the office on the day Millage said he hurt his back, so Millage told Dorinda Gluck, the cashier, that he had hurt himself. Ms. Gluck confirmed that Millage told her on February 21, 2002, that he had just injured his back outside. Millage also testified that he told the supervisor on duty, Bill Burger, and learned that he would have to report the injury to Gene Nichols.[2]
Nichols returned to work after the incident. In fact, Nichols testified that he spoke to Millage on February 21, 2002-the same date of the alleged injury:
I periodically walk the yard and I was out the morning of the, I think it was the 21st, and he [Millage] was limping a *1173 little bit, looked to be favoring his right leg. I asked him what was wrong and he said that he had a bunion on his foot that was killing him. And I said, man, I don't see how you can work like that, why don't you go to the doctor? And he said that he didn't have any money.... I told him that things being like that, that I would send him to the doctor and pick up the tab, get the bunion checked on so he could  I don't have that many employees so I like to keep them in shape. I offered to pick up the tab on it and let him go to the doctor to get the bunion checked on.
Nichols stated that Millage did not mention any back injury before Nichols sent Millage to the doctor.
According to the medical record exhibits, Millage saw Dr. Clifton Salmon on February 21, 2002, the same day that Millage testified that he injured his back. The doctor's report states:
44 yo bm to clinic [complaining] of low back pain radiating down [illegible] legs, pt states that [symptoms] started a/b 2 weeks ago. Now reports that legs feel weak. Pt states that he can't identify one specific thing that has caused the pain, but does state that he does a lot of heavy lifting and bending.
The doctor diagnosed Millage with a lumbar strain. On February 24, 2002, Dr. Salmon wrote a note specifying that Millage was to work only light duty with no lifting for one week or be off work for one week, and the next day the doctor wrote another note specifying light duty for Millage "for 1 week until cleared by MD" or, if no light duty was available, then Millage was to stay home.
Millage returned to work on light duty, but he testified that his pain got worse after he went back to work. On March 8, 2002, Millage went to the emergency room at LSU Medical Center with complaints of back pain. He gave a history of low back pain and leg weakness for two weeks and that "he was lifting wood at work when he hurt his back." Millage was diagnosed with back strain and given ibuprofen.
On March 11, 2002, Dr. Salmon released Millage to work on light duty. That same day, Millage began seeing a chiropractor, Dr. Pat Clawson, whose deposition was introduced into evidence. Via deposition, Dr. Clawson related that Millage initially gave a history of "trouble with his low back due to a job lifting or lifting injury at work. He couldn't pinpoint exactly the specifics of it, but he just knew his back started hurting at work." Dr. Clawson's records state that Millage came for treatment "of injuries sustained during an industrial accident, which occurred while working for Builder's Lumber Supply in Homer, LA. James' chief complaints include LBP, onset one week prior to 2-24-02, at which time Dr. Cliff Salmon saw him." The doctor believed that Millage suffered from a lumbar sprain/strain to the paraspinal muscles of the lumbrosacral region. Dr. Clawson treated Millage with manual therapy, hot packs, and electrical stimulation. Millage saw Dr. Clawson again on March 12, 13, 15, 20, and 25.
On March 15, 2002, Millage obtained a new note from Dr. Salmon containing an instruction to do light duty work and to sit frequently. The employer was unable to accommodate this instruction and sent him home; he did not thereafter return to work. Millage testified that he was subsequently unable to see Dr. Salmon because the employer would not pay for further therapy.
On March 18, 2002, Dr. Salmon wrote Millage a note "to whom it may concern" instructing that Millage not be allowed to lift more than 20 pounds for his own safety.
At the conclusion of his therapy with Dr. Clawson on March 25, 2002, Millage still *1174 had complaints of mild pain but had a normal range of motion. Dr. Clawson's records also indicate his impression, related to an insurance adjuster on March 25, 2002, that "there was no specific incident that caused the pain to Millage." In his deposition, Dr. Clawson explained:
Q: In your reports it indicates that it was your opinion that there was no specific incident that caused the pain to Millage. What did you mean by that?
A: He didn't say, well, I picked up a 2 by 4 at 10:05.... He just said that day he noticed his back was hurting. He thought it would go away and then as time went on it continued to get worse and that's when he reported it to his supervisor who I understood was supposed to report it to the boss.
Q: So he never told you that a specific accident occurred, he just told you that after a day of work he had aches and pains; is that what you recall?
A: I think it was during that day. I don't think it was after work. He went and reported it the day that he thought he hurt himself. But he didn't remember one specific shingle or one specific 2 by 4 that he picked up.
The doctor wrote in his records that Millage could return to work on March 25, 2002. To the contrary, Millage testified that his back got no better during his treatment with Dr. Clawson.
On April 1, 2002, Dr. Salmon wrote Millage another note excusing him from working until a functional capacity exam could be completed. These notes reflected that Millage was still complaining of lower back pain and spasm. The doctor's report indicates: "BACK: Reveals subjective left lower para spinous tenderness," indicates that the visit is for "[Follow up] of lumbar strain" of "low complexity"; the report does not include any objective finding of injury.
On June 30, 2002, Millage had an x-ray of his lower back. The radiologist's impression after reviewing the x-ray was "negative lumbar spine series" and the "findings" section of the report did not indicate any abnormality.
On September 12, 2002, Millage returned to the LSU emergency room with complaints of lower back pain that, according to the history he gave, commenced "while lifting something on the job." Doctors scheduled an MRI and advised him to continue taking anti-inflammatory medicine and to rest.
On November 6, 2002, Millage had an MRI, revealing degenerative disk disease at L4-5 and L5-S1. Millage made another visit to LSU on November 20, 2002, and repeated complaints of lower back pain as well as complaints of numbness in his legs. He was prescribed pain medicine.
On February 12, 2003, Millage returned to see Dr. Clawson for reevaluation. Millage gave Dr. Clawson a history of continuing back pain; Dr. Clawson's records reflect that "James is here today for eval and exam of injuries sustained during an industrial accident, while working for Builders Lumber Supply in Homer, LA. The accident occurred on or about 2-17-02."
At this visit, Millage completed a questionnaire concerning his pain. Dr. Clawson assigned him a 40%, or moderate, disability rating. The doctor said that Millage was not, at the time of the examination, capable of returning to work as a laborer but that he would likely be able to return to some type of employment after completing a work-hardening program.
The OWC found that Millage suffered an accident at work on February 21, 2002, that he was entitled to temporary total disability benefits from February 25, 2002, through March 10, 2002, and from March *1175 13, 2002, forward, and that he was entitled to payment of medical expenses. The OWC rejected the claimant's demand for penalties and attorney fees. Finding no compensable work-related accident, we reverse.

DISCUSSION
The MRI of Millage's back taken in late 2002 revealed that he suffered from degenerative disk disease. Degenerative disc disease is specifically excluded from the classification of occupational diseases and is not compensable under the Worker's Compensation Act. La. R.S. 23:1031.1(B); Qualls v. Stone Container Corp., 29,794 (La.App.2d Cir.9/24/97), 699 So.2d 1137, writ denied, 1997-2929 (La.2/6/98), 709 So.2d 736. Accordingly, plaintiff's burden was to establish that an "accident" producing "injury" occurred in this instance as those terms have been defined under the Act. La. R.S. 23:1021(1) and (7) and 1031. Qualls, supra.
La. R.S. 23:1021 provides, in part:
(1) "Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
...
(7)(a) "Injury" and "personal injuries" include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted.
In a workers' compensation action, the plaintiff must establish a work-related accident by a preponderance of the evidence. Bruno v. Harbert International Inc., 593 So.2d 357 (La.1992). If the evidence leaves the probabilities evenly balanced, or if it shows only a possibility of a work-related event or leaves it to speculation or conjecture, then the plaintiff fails to carry his burden. Qualls, supra. As this court stated in Jones v. A T & T, 28,059 (La.App.2d Cir.2/28/96), 669 So.2d 696:
While the worker's testimony alone may be sufficient to discharge that burden, it will be inadequate where (1) other evidence discredits or casts serious doubt upon the worker's version of the incident; or (2) the worker's testimony is not corroborated by the circumstances following the alleged incident.... Such corroboration, of course, may include medical evidence and the testimony of fellow workers, spouses, or friends.... So too, although La. R.S. 23:1021(1) defines "accident" to encompass a weakened condition which collapses due to a precipitous event, that definition does not include a weakened condition which gradually degenerates over time. Thus, in cases such as the matter at hand, the key requirement is that a precipitous event directly produce sudden objective findings of an injury rather than a mere manifestation of a gradual deterioration or progressive degeneration....
(Citations omitted.)
Although a pre-existing medical condition will not bar recovery if the work accident aggravated, accelerated, or combined with the condition to produce the disability, a claimant still must establish by a preponderance of the evidence a causal relation between accident and disability. Jones, supra.
Although factual findings produced below must be afforded great deference on appeal, they should be reversed when clearly wrong in light of the entire record. Jones, supra.
*1176 We conclude that the WCJ was clearly wrong in finding that Millage suffered an "accident" while working for BLS. In nearly every respect, the record contradicts Millage's version of events. Most notable among the numerous discordant pieces of evidence is the medical report of Dr. Salmon from February 21, 2002. This record specifies that Millage "can't identify one specific thing that has caused the pain...." This is irreconcilable with Millage's testimony that his pain had a sudden onset while lifting at work. In addition, the records of Dr. Clawson also indicate Dr. Clawson's opinion that "there was no specific incident that caused the pain to Mr. Millage...." As the doctor explained, "He went and reported it the day that he thought he hurt himself. But he didn't remember one specific shingle or one specific 2 by 4 that he picked up." These inconsistencies are particularly noteworthy in this case because there were no witnesses to the accident other than Millage himself. In such cases, evidence contradicting the worker's version of events takes on greater significance. Compounding the problem in this case is the obvious error in the date of the incident given by Millage. At trial he testified that the incident at work happened on February 21, 2002, but the medical record from that date reflects that he had been having pain for as long as two weeks prior to that date. Ms. Gluck testified that Millage complained to her on February 21, 2002, that he had hurt his back that day, but again the medical records contradict the date. Nichols testified that he observed Millage limping on February 21, 2002, and said that Millage attributed his limp to a bunion, not to a lifting accident.
Even allowing for the trial court's discretion to accept or reject the testimony of a witness, the constellation of inconsistencies in this record cannot support a finding that the claimant suffered an accident at work. The record at most shows the possibility that Millage suffered an accident at work.
Parenthetically, we also observe that Dr. Clawson had released Millage from treatment for a back sprain/strain as early as March 25, 2002, and that there was no proof in this record to connect Millage's subsequent back problems, including degenerative disk disease, to any purported accident or injury at work.

DECREE
The judgment below is hereby reversed. Costs of this appeal are assessed to Millage, whose demand for penalties and attorney fees is likewise rejected.
REVERSED AND RENDERED.
NOTES
[1] This information is provided, and this opinion is published, pursuant to La. R.S. 23:1310.5(F).
[2] The transcript reads "Nicholson" but the owner indicated in his testimony that his name is Nichols.